UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| PAMELA L. MAGGART, ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 2:08-cv-0005 |
| v. ) | Judge Wiseman/Brown |
| ) | |
| MICHAEL ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| Defendant. ) | |

To: The Honorable Thomas A. Wiseman, Jr., Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Income (SSI), as provided under Title II of the Social Security Act as amended. The case is currently pending on plaintiff's motion for judgment on the administrative record. (Docket Entry No. 16). For the reasons stated below, the Magistrate Judge recommends that plaintiff's motion for judgment be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff filed her applications for SSI and DIB on June 20, 2004,[1] alleging that she became disabled and unable to work on September 7, 2003, due to cervical spine injuries, high blood pressure, metabolic syndrome, diabetes, high cholesterol, catacolamines in urine, heart problems, asthma, anemia and migraines. (Tr. 60, 71, 75). Plaintiff's applications were denied initially and

---

[1] Plaintiff protectively filed her application for SSI on June 15, 2004. (Tr. 71).

1

upon reconsideration. (Tr. 36, 41-44). Plaintiff then filed a request for a hearing by an Administrative Law Judge ("ALJ"). (Tr. 34). On December 5, 2006, a hearing was held. (Tr. 660-676). Plaintiff, who was represented by counsel, and a vocational expert (VE) testified. (Tr. 660-676). On March 15, 2007, the ALJ issued a denial of benefits. (Tr. 14-23).

The ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2.  The claimant has not engaged in substantial gainful activity since September 7, 2003, the alleged onset date.

3.  The claimant has the following severe impairments: obesity, degenerative disk disease in her cervical and lumbar spine, hypertension, dysmetabolic syndrome, diabetes mellitus, and asthma.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to light work activity lifting twenty pounds occasionally and ten pounds frequently, sitting for two hours in an eight-hour day, standing and/or walking for up to six hours in an eight-hour day; avoiding more than occasional climbing, stooping, bending from the waist to the floor, crouching, crawling; avoiding climbing ramps.

6.  The claimant is capable of performing past relevant work as a dispatcher, waitress, cashier, and retail salesperson. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

7.  The claimant has not been under a "disability," as defined in the Social Security Act, from September 7, 2003, through the date of this decision.

On April 4, 2007, Plaintiff sought review from the Appeals Council. (Tr. 12-13). On November 19, 2007, the Appeals Council denied plaintiff's request for review of the ALJ's decision, thereby rendering that decision the final decision of the Commissioner. (Tr. 6-9). This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the

2

Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. Id.

## II. REVIEW OF THE RECORD

Both the Plaintiff and the Defendant have filed comprehensive reviews of the facts in this matter. Having reviewed both the Plaintiff's and the Defendant's filings, in addition to the record as a whole, the Magistrate Judge will address the facts relevant to the one statement of error raised by the Plaintiff relating the weight given to the opinion of treating physician Dr. Brad Seitzinger, rather than repeating Plaintiff's entire medical history.

Dr. Seitzinger began treating Plaintiff on May 8, 2002, and continued to regularly treat Plaintiff for her various ailments throughout 2003, 2004, and 2005. (Tr. 338).[2] However, Plaintiff did not complain of neck and shoulder pain until March 18, 2003. (Tr. 334). There is no indication that Dr. Seitzinger prescribed any pain medication at that time in response to Plaintiff's complaints nor is there any indication that Plaintiff complained of neck and shoulder pain again until almost a year later. (Tr. 334). However, during this year, Plaintiff reported to Dr. Seitzinger that she was not in any real pain. (Tr. 332, notes dated 9/08/03).

On October 22, 2003, Plaintiff completed an exercise capacity questionnaire in which she indicated that she could take care of herself, walk indoors, climb a flight of stairs or walk up a hill, run a short distance, do light and moderate work around the house including vacuuming, sweeping floors and carrying groceries, could rake leaves, weed or push a power motor, could have sexual relations, and could participate in moderate and strenuous sports, including golf,

---

[2]Dr. Seitzinger may have continued to treat Plaintiff beyond this time but the last treatment note in the record is in 2005. (Tr. 583). Plaintiff's brief indicates that she began to see Dr. Rex Agbenohevi for her primary medical care in August 2005. (Docket Entry 17, Page 5).

3

bowling, dancing, tennis, swimming, football, basketball and skiing. (Tr. 209).

On February 25, 2004, almost a year after her initial report of pain, Plaintiff again reported neck and shoulder pain as a result of her lifting something. (Tr. 328). Dr. Seitzinger again did not prescribe any pain medication and instead ordered an MRI of the neck. (Tr. 328). The next day, on February 26, 2004, an MRI of Plaintiff's cervical spine indicated cervical spondylosis with hypertrophy at C5-6. (Tr. 341).

On March 5, 2004, Plaintiff was referred to Dr. Joel S. Tanedo for her hypertension. (Tr. 250). Plaintiff reported that she had occasional left neck and shoulder blade pain which would last several hours and then would resolve spontaneously. (Tr. 250). On April 5, 2004, Plaintiff reported to Dr. Tanedo that she was able to do her activities of daily living without much difficulty. (Tr. 248).

On April 14, 2004, Plaintiff again complained of neck pain and Dr. Seitzinger noted a reduction in range of motion in the neck. (Tr. 327). However, Dr. Seitzinger again did not prescribe any pain medications. (Tr. 327). On May 5, 2004, Plaintiff again complained of neck pain, as well as ear pain, and Dr. Seitzinger prescribed hydrocodone. (Tr. 326).

On June 15, 2004, Plaintiff complained to Dr. Seitzinger of back pain for the first time, who continued to treat Plaintiff with hydrocodone. (Tr. 325). On June 19, 2004, an MRI of the thoracic spine was normal. (Tr. 340). On June 30, 2004, Dr. Seitzinger ordered an MRI of the lumbar spine in response to Plaintiff's continued complaints of back pain. (Tr. 325). On July 2, 2004, the results of an MRI of the lumbar spine indicated that Plaintiff had a mild insignificant disc bulge at L5-S1. (Tr. 339). On July 7, 2004, Dr. Seitzinger prescribed physical therapy for Plaintiff's neck and back pain. (Tr. 272).

4

Until August 2004, Dr. Seitzinger continued to treat Plaintiff's pain with hydrocodone. (Tr. 324-325). On August 2, 2004, Dr. Seitzinger stopped the hydrocodone treatment, instead prescribing Percocet. (Tr. 324). On October 1, 2004, Plaintiff reported that she continued to have back pain, taking both Soma and Percocet three times a day to bring her pain down to a 6 on a 10 point scale so she could function. (Tr. 322). Dr. Seitzinger prescribed a three month supply of both Soma and Percocet. (Tr. 322).

On March 10, 2005, Plaintiff again reported neck and back pain and Dr. Seitzinger continued to treat this pain with Percocet and Soma. (Tr. 584). On March 21, 2005, Plaintiff was seen by Dr. Robert S. Davis, a specialist in neurological and spine surgery, who fitted Plaintiff with a cervical collar, ordered a new MRI of the cervical spine, and opined that Plaintiff could pursue her activities as tolerated and continue medication management through Dr. Seitzinger. (Tr. 558). On April 2, 2005, an MRI of the cervical spine indicated degenerative disc disease at the C5-6 level causing mild to moderate spinal stenosis. (Tr. 560). Dr. George Mead opined that when compared with Plaintiff's prior cervical MRI on February 26, 2004, the findings had not change significantly and that Plaintiff's condition was remaining stable. (Tr. 560).

On April 14, 2005, Plaintiff reported to Dr. Seitzinger continued problems with neck and back pain as well as migraines. (Tr. 583). Dr. Seitzinger continued to treat Plaintiff with Percocet, prescribing her a three month supply. (Tr. 583). On June 23, 2005, Plaintiff was again seen by Dr. Davis who discussed Plaintiff's treatment options for her neck and back pain, including possible surgeries. (Tr. 557). The Plaintiff elected to continue with conservative treatment of her cervical pain and Dr. Davis opined that Plaintiff could pursue her activities as

5

tolerated under the care of Dr. Seitzinger for her general symptom management. (Tr. 557).

On May, June, July and August 2005, Dr. Seitzinger noted that Plaintiff continued to have back and neck pain which he continued to treat with pain medications, noting decreased range of motion in the neck and back. (Tr. 564-582).

Dr. Agbenohevi began treating the Plaintiff in August 2005. During his treatment from August 18, 2005 through November 13, 2006, Plaintiff continued to report neck and pain ranging from a 5/10 to an 8/10. (Tr. 622-645). Plaintiff reported her pain is better controlled with medications but that she does have occasional periods of increased pain which interfered with her sleep and activities of daily living. (Tr. 637, 638).

On July 21, 2006, Plaintiff presented to the Cookeville Regional Medical Center Emergency Room for treatment of a knee sprain/strain after she fell approximately 2-3 feet off of a tractor and twisted her leg. (Tr. 590). On August 4, 2006, Plaintiff reported to Dr. Agbenohevi that she had twisted her ankle when she jumped from her father's tractor and that she had been seen at the ER but continued to have swelling and pain when walking. (Tr. 626).

On November 6, 2006, Plaintiff reported that she could not stand for more than 10 to 15 minutes at a time and had a constant, throbbing pain in her back and neck. (Tr. 155-156). Plaintiff stated that her pain medication is effective after about 30 minutes and reduced her pain from an 8/10 to a 4/10 for 2-3 hours. (Tr. 156). Plaintiff further reported that she reads, sews, drives a car every Sunday and to go grocery shopping, that she likes to go camping in the summer, and she walk twice a week for a mile in addition to her back exercises. (Tr. 159, 160).

On November 28, 2006, Dr. Seitzinger completed a Medical Source Statement of Ability To Do Work-Related Activities (Physical). (Tr. 650-653). Dr. Seitzinger opined that because of

6

chronic neck and back pain,[3] Plaintiff could lift and/or carry less than 10 pounds occasionally, could stand and/or walk less than 2 hours in an 8-hour workday, could sit about 4 hours in an 8-hour workday, was limited in pushing and pulling, and would require a sit/stand option to relieve pain or discomfort. (Tr. 650-651). Dr. Seitzinger also stated that Plaintiff's pain was severe enough to constantly interfere with her attention and concentration, that Plaintiff was incapable of even low stress jobs, that she would need unscheduled breaks during an 8-hour workday, that she should elevate her legs during a prolonged sitting, that her impairments were likely to produce good and bad days, that she would be absent from work more than 4 times a month, that she should never climb, kneel, crouch or crawl and that she could occasionally kneel, that Plaintiff was limited in reaching, handling, fingering and feeling due to carpal tunnel syndrome in her right hand, that Plaintiff was unlimited in her ability to speak, hear or see, and that Plaintiff should avoid almost all environmental limitations. (Tr. 652-653).

### III. CONCLUSIONS OF LAW

#### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

---

[3]Dr. Seitzinger treated Plaintiff for a variety of ailments, including hypertension, which was apparently difficult to control, and diabetes. However, Dr. Seitzinger based his restrictions specifically on Plaintiff's chronic neck and back pain, as well as carpal tunnel syndrome, and not any of Plaintiff's other ailments.

7

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

### B. Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

(1) If the claimant is working and the work constitutes substantial gain activity, benefits are automatically denied.

(2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3) If the claimant is not working and has a severe impairment, it must be

determined whether he or she suffers from one of the "listed" impairments[4] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5) Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the valuation process can be carried by relying on the medical vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id*. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner

---

[4]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423 (d)(2)(B).

C. Plaintiff's Statement of Errors

Plaintiff alleges one statement of error in the ALJ's decision. Specifically, Plaintiff argues that the ALJ erred in rejecting the opinion of Plaintiff's treating physician, Dr. Seitzinger, who assessed Plaintiff as being unable to perform even sedentary work. (Docket Entry 17, page 7; Tr. 649-653).

An ALJ should give enhanced weight to the findings and opinions of treating physicians since these physicians are the most able to provide a detailed description of a claimant's impairments. 20 C.F.R. § 404.1527(d)(2). Further, even greater weight should be given to a physician's opinions if that physician has treated the claimant extensively or for a long period of time. 20 C.F.R. § 404.1527(d)(2)(I)-(ii). However, if there is contrary medical evidence, the ALJ is not bound by a physician's statement and may also reject it if that statement is not sufficiently supported by medical findings. 20 C.F.R. § 404.1527(d); *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (1994).

While the ALJ is not bound by the opinions of Plaintiff's treating physicians, the ALJ is

10

required to set forth some sufficient basis for rejecting these opinions. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). In discrediting the opinion of a treating source, the ALJ must consider the nature and extent of the treatment relationship, the length of the treatment relationship and the frequency of examinations, the medical evidence supporting the opinion, the consistency with the opinion with the record as a whole, the specialization of the treating source, and any other factors which tend to support or to contradict the opinion. 20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004).

Additionally, it should be noted that a treating physician's statement that the claimant is "disabled" does not bind an ALJ as the definition of disability requires consideration of both medical and vocational factors. 20 C.F.R. § 404.1527(e)(1); *King v. Heckler*, 742 F.2d 968, 973 (1984).

In the instant case, the ALJ stated that Dr. Seitzinger's opinion of Plaintiff's limitations were not supported medical evidence. Specifically, the ALJ stated that:

> Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating doctor. Yet a review of the record in this case reveals no significant restrictions recommended by the treating doctor. The possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provided such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. (Tr. 22).

The Plaintiff argues that Dr. Seitzinger's opinion is sufficiently supported by medical findings and that the ALJ did not reference any portions of the medical evidence that contradict Dr. Seitzinger's opinion. (Tr. 17). Further, the Plaintiff contends that the ALJ's statements regarding treating physician reports in general indicates "a level of suspicion with regard to the assessments

11

of treating physicians that would bias the ALJ against such reports" and that "there is not evidence to support such an assumption" in the instant case. (Docket Entry 17, Page 8).

The Commissioner argues that the ALJ accurately opined that nowhere in Dr. Seitzinger's treatment record or in the administrative record as a whole were there such severe functional restrictions as those listed in Dr. Seitzinger's opinion. (Docket Entry 20, Page 11). The Commissioner refers to Dr. Seitzinger's treatment records over an approximately three year period, arguing that these records indicated that Plaintiff had variable symptoms over time, with "one functional limitation or another but no overall loss of function." (Docket Entry 20, Page 112-13). Further, the Commissioner advances that the ALJ "suitably observed that when a treating opinion diverges so widely from the evidence, it is likely to be a sympathetic, rather than dispassionate, opinion and, insofar as this was true, could afford no appropriate basis for allowing a disability claim under the Act." (Docket Entry 20, Page 13).

In this case, the Magistrate Judge finds that the ALJ set forth a reasonable basis for rejecting the opinion of Dr. Seitzinger, and as such, the ALJ's decision is supported by substantial evidence for the reasons stated below. Specifically, the ALJ stated that Dr. Seitzinger's opinion was not supported by the medical evidence and that his opinion departed substantially from the rest of the evidence in the record. After a comprehensive review of the record, it is clear that the ALJ's opinion is supported by substantial evidence.

Dr. Seitzinger limited the Plaintiff to less than sedentary work because of chronic neck and back pain. However, upon review of Dr. Seitzinger's treating records, as well as the record as a whole, there is no indication to support such severe restrictions. Plaintiff first complained of neck and shoulder pain on March 18, 2003. (Tr. 334). Almost a year later, on February 26, 2004, an MRI

of Plaintiff's cervical spine indicated cervical spondylosis with hypertrophy at C5-6. (Tr. 341). During that year, Plaintiff reported to Dr. Seitzinger on at least one occasion that she was not in any real pain. (Tr. 332). Also during that year, on October 22, 2003, Plaintiff completed an exercise capacity questionnaire in which she indicated that she could take care of herself, walk indoors, climb a flight of stairs or walk up a hill, run a short distance, do light and moderate work around the house including vacuuming, sweeping floors and carrying groceries, could rake leaves, weed or push a power motor, could have sexual relations, and could participate in moderate and strenuous sports, including golf, bowling, dancing, tennis, swimming, football, basketball and skiing. (Tr. 209).

On March 5, 2004, one week after Plaintiff's cervical MRI, Plaintiff reported to Dr. Tanedo that she had *occasional* left neck and shoulder blade pain which would last several hours and then would resolve spontaneously. (Tr. 250). One month after that, on April 5, 2004, Plaintiff reported to Dr. Tanedo that she was able to do her activities of daily living without much difficulty, in spite of *occasional* left and right arm numbness. (Tr. 248).

It was not until May 5, 2004, that Dr. Seitzinger prescribed any pain medication for Plaintiff's neck and back pain. In June and July of 2004, MRIs of the thoracic spine were normal and MRIs of the lumbar spine indicated that Plaintiff had a mild insignificant disc bulge at L5-S1. (Tr. 339, 340). On March 21, 2005, Dr. Davis opined that Plaintiff could pursue her activities as tolerated and continue medication management through Dr. Seitzinger after fitting her with a cervical collar. (Tr. 558). On April 2, 2005, a second MRI of the cervical spine indicated degenerative disc disease at the C5-6 level causing mild to moderate spinal stenosis. (Tr. 560). Dr. Mead opined that when compared with Plaintiff's prior cervical MRI taken on February 26, 2004, the findings had not changed significantly and Plaintiff's condition was remaining stable. (Tr. 560).

13

In June 2005, Plaintiff elected to continue with conservative treatment of her neck and back pain and Dr. Davis opined that Plaintiff could pursue her activities as tolerated. It also appears that on July 21, 2006, Plaintiff presented to the Cookeville Regional Medical Center Emergency Room for treatment of a knee sprain/strain after she fell/jumped approximately 2-3 feet off of a tractor and twisted her leg/ankle. (Tr. 590, 262). Four months after this accident, in November 2006, Dr. Seitzinger opined that Plaintiff was totally disabled.

Dr. Seitzinger's treatment records as well as the Plaintiff's treatment records as a whole indicate that Plaintiff was treated conservatively for her pain. Her MRIs are either normal or indicate minimal to moderate deficiencies. (Tr. 339, 340, 560). As late as April 2004, Plaintiff reported to Dr. Tanedo that she was able to do her activities of daily living without much difficulty. (Tr. 248). This was prior to any pain medication being prescribed. Later, Plaintiff reported on several occasions that she was able to complete her daily activities while using her pain medication. Further, Plaintiff described her pain as occasional. (Tr. 250, 637, 638).

The Magistrate Judge would note that Plaintiff is alleging disability with an onset date of September 7, 2003. (Tr. 60, 71, 75). However, on October 22, 2003, Plaintiff indicated she could participate in strenuous sports, perform yard work, and could perform moderate work around the house. (Tr. 209). Further, as late as July 2006, Plaintiff was apparently participating in strenuous activities when she fell/jumped off of a tractor. (Tr. 590).

Given these reasons, the Magistrate Judge finds that substantial evidence supports the ALJ's decision.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004 (en banc).

ENTERED this 11TH day of February, 2009.

      _____
      JOE B. BROWN
      United States Magistrate Judge